UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 15-29917-A-7 |
| PAUL & TINA FARROW, | |
|     Debtors. | |
| ARMANDO GARCIA HERNANDEZ, | Adv. No. 16-2055 |
|     Plaintiff, | |
| vs. | |
| PAUL LANGFORD FARROW, ET AL, | |
|     Defendants. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Plaintiff Armando Garcia Hernandez maintains that a debt arising from defalcations by chapter 7 debtors and defendants Paul Langford Farrow and Tina Bernice Farrow of partnership assets is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). The court largely agrees.

    This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334. This is a core

proceeding within the meaning of 28 U.S.C. § 157(B)(2)(I), in which the court has the constitutional power to enter a final judgment.

## Findings of Fact

1. The plaintiff and the defendants formed a partnership around November 2014 to distribute ice under the business name Polar Bear Ice.

2. The partners had no written partnership agreement.

3. The defendants also operated a separate business, Farrow Distributing, in which the plaintiff had no interest. Farrow Distributing was a Crystal Cream and Butter distributor in Sutter County. This distribution business had been operating for approximately 20 years when the parties entered into their partnership.

4. The partners orally agreed as follows:

    a. Polar Bear Ice would sell ice and no other products.

    b. Profits and losses would be divided evenly between the plaintiff, on the one hand, and the defendants, on the other hand.

    c. The plaintiff and the defendants intended to piggyback the new partnership's business on Farrow Distributing's business assets. That is, Polar Bear Ice would use Farrow Distributing's business premises (located at 401 Colusa Avenue in Yuba City), employees, trucks, and equipment when possible. The partners would contribute cash, services, and materials whenever necessary. Only if and when the partnership was profitable would contributions, whether in

  kind or capital, be repaid and distributions made to the partners.

  d. Farrow Distributing also distributed ice. When the partnership was formed, the defendants agreed this would stop and all ice would be distributed through Polar Bear Ice for the benefit of the partnership.

  e. Mrs. Farrow was to serve as the bookkeeper for Polar Bear Ice although Mr. Farrow and the plaintiff also regularly made entries in the partnership's books. Mr. Farrow and the plaintiff were to deliver ice to customers.

5. As the partners began Polar Bear Ice, Farrow Distributing was in decline. It later ceased operating in September 2015. When it failed, it owed outstanding state and federal taxes of approximately $45,000, insurance premiums of more than $1,500, a bank loan exceeding $109,000, and more than $22,000 to a supplier.

6. However, Farrow Distributing managed to stay in business a bit longer than Polar Bear Ice. On August 14, 2015, Paul Farrow notified the plaintiff that their partnership was dissolved. It was not until September 2015 that Farrow Distributing closed its doors.

7. The partnership ended when the plaintiff questioned whether Polar Bear Ice's income and assets were being diverted by the defendants for the benefit of Farrow Distributing and/or the defendants. <u>See</u> Exhibit 12. When the plaintiff asked for an accounting and an explanation, he was advised in writing by Paul Farrow that their partnership was at an end. <u>See</u> Exhibit 10.

8. At first, the defendants offered to allow the plaintiff

to take over the partnership business.  See Exhibits 10 and 15.  By August 20 the defendants refused to follow through with this offer and the plaintiff was locked out of the business premises.  See Exhibit 16.

  9. The plaintiff asserts that the defendants diverted, both before and after August 14, the following assets for non-partnership purposes:

  a. $1,000 was taken from the partnership account and paid to Crystal Milk on account of an obligation owed by Farrow Distributing.  See Exhibit 1.

  b. $890 was taken from the partnership bank account and paid to Farrow Distributing.  See Exhibit 2.

  c. The partnership bank account was used to pay $5,774.03 to Penske for rental trucks used by Farrow Distributing, not the partnership.  See Exhibit 7.

  d. The partnership paid $5,500 for an event box which the defendants have retained since the partnership dissolved.  Also, the defendants inflated the cost of this item by adding an additional $2,750 to the purchase price on its books.  See Exhibit 4.

  e. The defendants diverted $10,793.73 from the partnership account to pay down an obligation Farrow Distributing owed to Wonder Ice Cream.  See Exhibit 3.

  f. The partnership purchased $114,486.05 in ice from, primarily Diamond Ice and Wonder Ice, but the defendants recorded the purchases as $131,797.  Even when three other purchases from Food Maxx and San Francisco Ice totaling $1,226.59 are taken into account, the defendants overstated

4

this expense by $9,644.98.  See Exhibits 5, 11, 15, 22.

g. $2,497.91 belonging to the partnership was misappropriated by the defendants.

h. The plaintiff paid to the defendants $3,900 as a partnership contribution but the defendants never deposited this into the partnership bank account.

i. Mr. Farrow did not deposit cash totaling $674.48 collected from Polar Ice customers on August 13, 2015 into the partnership bank account.  See Exhibit 9.

j. Defendants took $391.98 from the partnership account to purchase a television for their own use.  See Exhibit 6.

k. The defendants retained for their benefit five display doors belonging to the partnership. These have a value of $500 each, a total of $2,500.

l. The defendants retained for their benefit the partnership's ending ice inventory, worth $13,706.20 at cost.  See Exhibit 15.

The plaintiff demands that these amounts, totaling $60,317.56, be repaid so that the plaintiff can retire the debts of the partnership and complete its dissolution. He also asks that this debt be declared nondischargeable.

10. The defendants deny that $60,317.56 of partnership money and assets were misappropriated.

a. The partnership used a freezer at Farrow Distributing and the defendants reimbursed themselves the $1,000 for the electricity consumed by the freezer.  See Exhibit B.

However, as noted above, use of Farrow Distributing's business premises, including utilities, was one of the

defendants' contributions to the partnership.  See Exhibit I.  And, the parties agreed that contributions would not be repaid until the partnership was profitable.  It was never profitable, or at least the plaintiff was informed by the defendants that it was not profitable.  Hence, the $1,000 should not have been withdrawn from the partnership account by the defendants.

b.   The $890 allegedly was paid to Farrow Distributing as reimbursement for a Penske rental truck used by the partnership in May and June 2015 but incorrectly billed to, and paid by, Farrow Distributing.  See Exhibit C.

The defendants, however, produced no invoice from Penske in the amount of $890.  See Exhibit C.  And, as noted by counsel for the plaintiff, a truck rental expense from Penske was not even entered on the partnership's expense journal until August 17, after the partnership had dissolved.  That entry lumped together all rental charges for two trucks, one leased from November 5, 2014 to July 6, 2015, and a second from May 18, 2015 through August 15, 2015.  See Exhibit F, p. 30 of 36.  There is no indication in the expense journal that the rental expense had been paid by the defendants (unlike other expenses entered in the partnership's expense journal but paid by the defendants).

Based on this record, the court finds that the payment of the $890 cannot be linked to an expense paid on behalf of the partnership.  It was misappropriated by the defendants.

c.   The partnership bank account was used to pay $5,774.03 to Penske for a milk truck rented by Farrow Distributing,

not the partnership. See Exhibit 7.

When the plaintiff challenged the payment of this expense, the defendants attempted to set off $4,479 they paid on behalf of the partnership for ice delivery trucks against the $5,774.03. See Exhibit H. The $1,295.03 difference was accounted for as a capital contribution by the defendants to the partnership. See Exhibit I.

However, under the agreement between the parties, amounts each contributed were to be repaid only when the partnership was profitable. The $4,479 could not be taken as a set off. It was a capital contribution, not an expense.

d.  The defendants acknowledge that they now possess the event box and that it is an asset of the partnership. But, the defendants deny that have inflated the cost of the event box. They admit that Exhibit 4 misstates the cost of the event box by an additional $2,750. Exhibit 4, however, was a preliminary version of the partnership expense journal. Exhibit F is the final version and it correctly lists the expense at $5,500.

The court finds that the defendants have not somehow misappropriated the $2,750. However, they have appropriated the event box for the their own use.

e.  The defendants acknowledge that on June 27, 2015, $10,793.73 was paid by the partnership to pay an obligation Farrow Distributing owed to Wonder Ice Cream. Allegedly, this done because the partnership wished to purchase ice from Wonder Ice Cream over the July 4 holiday. Because the

partnership did not have an account with Wonder Ice Cream and because Farrow Distributing's account was at its credit limit, the defendants used partnership funds, with the plaintiff's consent, to reduce Farrow Distributing's debt to Wonder Ice Cream and then purchased ice on credit for the partnership.

The court finds that the plaintiff did not agree to, or even discuss, such an arrangement.

If the partnership paid an obligation of Farrow Distributing to Wonder Ice Cream, why didn't Farrow Distributing pay for the ice purchased by the partnership? In fact, the partnership paid for that ice. See Exhibits 5 and F.

The defendants instead maintain that they gradually reimbursed the partnership for the $10,793.73 and that their payments to the partnership are documented in Exhibit D. Exhibit D, however, was not prepared contemporaneously with these alleged payments. This is made obvious by the fact that one of the alleged payments to the partnership ($1,000 on May 28, 2015) predates the $10,793.73 paid by the partnership to Wonder Ice Cream.

Exhibit D was prepared after the plaintiff had accused the defendants of misappropriating partnership funds to make it appear he had agreed to a loan and that it had been repaid.

A review of the alleged payments made by the defendants to the partnership, as summarized on Exhibit D, reveals that there is no documentation or corroboration that these

amounts were to retire a loan to the defendants from the partnership. It is equally plausible from the record that most of these "payments" were funds that belonged to the partnership or that were due it by its customers.

Only two of the payments, $800 and $2,000, post-date the "loan" and were from the defendants to the partnership. The court will credit these amounts against the obligation of the defendants to the plaintiff.

Exhibit D is an after-the-fact attempt to cast the $10,793.73 misappropriation of partnership funds as a loan, and to falsely document, other than the payment of $2,800, its repayment.

f.  While the defendants concede that the partnership purchased $114,486.05 of ice from Diamond Ice and Wonder Ice, and that ice purchases are recorded at $131,797.30 on the partnership books, they deny that they have inflated ice purchases. They maintain that the plaintiff has not accounted for the fact that ice also was purchased from other suppliers. See Exhibit F.

However, a review of Exhibits 5 and F reveal that the documentary evidence produced by both sides includes proof of only three purchases of ice from two other sources: two purchases on July 16, 2015 from Food Maxx totaling $923.14 and one purchase of $302.95 on July 15, 2015 from San Francisco Ice. These three purchases total $1,226.59, not $9,644.98. Further, the plaintiff has taken these three purchases into account. See Exhibit 11. The court finds that this expense was overstated by the defendants on the

9

partnership books by $9,644.98.

g. The defendants maintain that the $2,497.91 was used to make cash purchases of fuel for the partnership's delivery trucks. As a general practice, however, the partnership used its credit cards, not cash, to purchase fuel. The plaintiff therefore asserts these purchases must have been for the Farrow Distributing delivery truck.

Mrs. Farrow testified that Polar Bear Ice operated two delivery trucks, sometimes three, as opposed to Farrow Distributing's one truck. Further, Polar Bear Ice delivered throughout a larger geographic area and Farrow Distributing's business was slower, particularly on weekends and holidays.

This testimony, however, is not inconsistent with the fuel having been purchased for Farrow Distributing. Comparing the dates of the cash receipts to the 2015 calendar reveals that all cash purchases were on weekdays, not weekends or holidays, and with the exception discussed immediately below, were at least seven days apart. Further, all but one purchase were in the immediate vicinity of Farrow Distributing.

The court finds that the $20 purchase in Elk Grove was not by Farrow Distributing inasmuch as it had no customers near that locale. Second, there were two fuel purchases on May 5 approximately 8 minutes apart. Because Farrow Distributing operated only one delivery truck, the court finds that one purchase of $160 is attributable to Polar Bear Ice.

h. The defendants' evidence, primarily Exhibit I, proves only that the plaintiff's $3,900 capital account was credited with the contribution. They produced no evidence that the $3,900 was deposited into the partnership bank account.

i. The failure to deposit cash totaling $674.48 collected from Polar Bear Ice customers on August 13, 2015 is confirmed in a handwritten note by Mrs. Farrow, Exhibit 9. While both defendants testified the note is incorrect because the money was deposited, there is no convincing corroboration of a deposit.

j. Defendants took $391.98 from the partnership account to purchase a television for their own use. See Exhibit 6.

The defendants concede that this was for the purchase of a television that should not have been charged to the partnership account. They claim the mistake was an innocent one. The receipt for the television was mistaken for a receipt for a printer purchased by the partnership.

k. The defendants admit that they have the five display doors belonging to the partnership.

l. The defendants deny that they sold the partnership's ending ice inventory. They maintain that the ice was made available to the plaintiff but he declined to pick it up. As a result, it melted.

However, the ice was not made available to the plaintiff because the defendants rescinded their offer to allow him to continue the partnership business. See Exhibits 10, 15, and 16. The court finds that the

defendants sold the inventory on hand.  This is corroborated by the fact that Exhibit E, the August 20 letter from Mr. Farrow to the plaintiff indicates that Mr. Farrow intended to sell the ice if the plaintiff did not agree to do so. Further, Exhibit F records the September 4 payment of two invoices from Riverview for truck rentals during the period of August 18 to August 31, 2015, after the plaintiff had been excluded from the business.

    11.  The defendants have misappropriated $54,293.31 in partnership assets.  This differs from the plaintiff's $60,023.31 demand in three respects: (1) the court finds that $2,800 of the $10,793.73 paid to Wonder Ice Cream was returned; (2) there is no phantom expense of $2,750 associated with the display box purchased by the partnership; and (3) $180 of the cash fuel purchases were by the partnership.

    12.  The defendants asserted at trial that the partnership had income of $192,870.40 in 2015.  <u>See</u> Exhibit I.  However, this total is not accurate.

    a.  According to the partnership's sales journal, it had $283,844.53 in gross ice sales and actually collected $261,524.48 of these sales.  <u>See</u> Exhibit 17.

    b.  According to the 2015 partnership tax return the defendants provided to the plaintiff, the plaintiff's proportional share of sales was $131,432.  Since the parties were 50/50 partners, this means sales for 2015 were $262,864.  <u>See</u> Exhibit 21.

    c.  The court takes judicial notice of Form 122A, the Statement of Current Monthly Income, etc., filed by the

      defendants in their chapter 7 bankruptcy case.  For the period June, July, and August 2015 alone, the defendants reported that Polar Bear Ice's income totaled $205,975.91. Even if it is assumed the partnership had no income from January through May 2015, Form 122A indicates that Polar Bear Ice had more income than $192,870.40 in 2015.

      d.   The court finds that the partnership's income in 2015 was $262,864.

   13.   The $69,993.60 discrepancy between the partnership's actual income, $262,864, and the defendants' testimony that it was only $192,870.40, corroborates for the court that the defendants misappropriated at least $54,293.31 from the partnership.

   14.   To the extent any of the conclusions of law below are findings of fact, they are incorporated by reference as findings of fact.

## Conclusions of Law

   15.   To the extent any of the foregoing findings of fact are conclusions of law, they are incorporated by reference as conclusions of law.

   16.   The defendants dissociated themselves from Polar Bear Ice by their express will and by wrongful conduct that adversely and materially affected the partnership's business.  <u>See</u> Cal. Corp. Code § 16601(1) & (5)(A).  This caused the dissolution of the partnership.

   17.   As the dissociating partners, the defendants are ineligible to wind up the partnership's business.  <u>See</u> Cal. Corp.

13

Code § 16803(a), (b). Only the plaintiff is entitled to wind up its business.

18. As the partner eligible to wind up the partnership's business, the plaintiff is entitled to collect and liquidate the partnership's assets and claims, discharge the partnership's liabilities, and then distribute any remaining assets to the partners. See Cal. Corp. Code § 16803(c).

19. One of the claims the plaintiff is entitled to collect and liquidate is the claim against the defendants arising from their misappropriation of $54,293.31 in partnership money and assets as outlined above.

20. Under California law, to be liable for conversion, a defendant must exercise dominion over another's personal property. See e.g., Poggi v. Scott, 167 Cal. 372, 375 (1914); Rest.2d, Torts, § 222A. It is not necessary to prove that the defendant acted with a wrongful intent or the intent to harm the owner of the property. A conversion is committed even if the defendant converted the property in error, in good faith, or with due care. Poggi v. Scott, 167 Cal. at 375. The plaintiff is required to show only that the act of conversion was intentional. Id.

21. The defendants converted for their own use $54,293.31 of partnership money and assets as outlined above. This conversion was intentional and done with the intent to deprive the partnership of its property.

22. Much of what the defendants took from the partnership was money. Generally speaking, money cannot be the subject of conversion. See Haigler v. Donnelly, 18 Cal.2d 674 (1941);

McKell v. Washington Mut., 142 Cal. App. 4th 1457, 1491 (2006). When the money taken, however, is a specific, identifiable sum, an action for conversion can be sustained. See Haigler, 18 Cal. 2d at 681. That is what has been proven in this case. The plaintiff has proven more than that money is missing. He has identified specific sums taken by the defendants at discrete points in time.

23. In order for a debt arising from a conversion to be nondischargeable under 11 U.S.C. § 523(a)(6) more than an intentional act must be proven. The defendant must act willfully and maliciously. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Baldwin v. Kilpatrick (In re Baldwin), 249 F.3d 912, 917 (9th Cir. 2001).

24. The term willful means a deliberate or intentional injury. Kawaauhau, 523 U.S. at 61. This requires proof not only that the actor intended to act, but that the injury was also intended by the actor. Id.

25. A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002) (citing In re Jercich, 238 F.3d 1202, 1209 (9th Cir. 2001)); see also Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir. 2005).

26. The court concludes that the defendants' conversion of $54,293.31 in partnership money and assets were both willful and malicious. The defendants took this property knowing it belonged to the partnership, using it to prop up the failing Farrow Distributing despite knowing that the loss of the partnership's

15

property would likely cause it to fail.

27. Whether or not the defendants are liable for conversion, their conduct also amounts to embezzlement of the $54,293.31. Embezzlement for purposes of 11 U.S.C. § 523(a)(4) occurs when a person entrusted with the property of another fraudulently appropriates it for his or her own benefit. In re Bucci, 493 F.3d 635 (6th Cir. 2007) *cert. denied* 128 S.Ct. 2903 (2008). It is not enough to show that property is missing; it must have been taken with the fraudulent intent to convert it for the benefit of the debtor to the detriment of the owner.

28. Here, the defendants as partners had rightful possession of the partnership's money and assets. They converted that property for their own benefit to the detriment of the partnership.

29. In California, "[p]artners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his co-partner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind." Leff v. Gunter, 33 Cal.3d 508, 514 (1983) (quoting Page v. Page, 55 Cal.2d 192, 197 (1961)).

30. Therefore, in the Ninth Circuit, California partners are fiduciaries within the meaning of section 523(a)(4). See Ragsdale v. Haller, 780 F.2d 794, 796-97 (9th Cir. 1986).

31. By misappropriating partnership money and assets as outlined above, the defendants have committed a defalcation of partnership assets in breach of their fiduciary obligation to the

1   plaintiff.  This defalcation was done with knowledge that the
2   property taken belonged to the partnership and it was taken in
3   order to advance the defendants' personal interests to the
4   detriment of the plaintiff and the partnership.
5      32.  Whether the defendants committed conversion,
6   embezzlement, or a defalcation while acting as fiduciaries, their
7   misappropriations were with the requisite fraudulent intent under
8   sections 523(a)(4) and (a)(6).  They were not the result of
9   confusion as to the terms of the partnership (see Paragraph 10(a)
10   above), or an innocent mix-up as to what was or was not a
11   partnership expense (see Paragraphs 10(b), (c), (g), and (j)
12   above).  Rather, they were concerted efforts to divert
13   partnership money and assets to benefit the defendants and their
14   other business, to the exclusion of the plaintiff and the
15   partnership.  This conduct must be viewed in the most pejorative
16   of lights given that the defendants took considerable pains to
17   cover up their misappropriations by under-reporting partnership
18   income by more than $60,000, creating a ledger falsely indicating
19   they had repaid the $10,793.73 "loan," and finally by withdrawing
20   from the partnership as soon as the plaintiff began to question
21   the defendants' use of partnership money and assets.
22      33.  A debt for obtaining money, property, or services by
23   fraudulent means is made nondischargeable by 11 U.S.C. §
24   523(a)(2)(A).  In a typical case, a debtor's fraud or trickery
25   induces a creditor to part with value for the benefit of the
26   debtor.  The fraud induces the creditor's loss.
27      34.  It has not been alleged, or proven, that fraud induced
28   the plaintiff to enter into the partnership or otherwise part

with property.  Rather, over nine months and in connection with the operation of the partnership's business, the defendants misappropriated partnership money and assets.  This loss is best addressed under sections 523(a)(4) and (a)(6), not section 523(a)(2)(A).

## Conclusion

The court will enter a judgment for the plaintiff on the second and third claims for relief in the complaint.  The defendants shall pay to the plaintiff $54,293.31.  This obligation is made nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6).

The plaintiff shall receive this sum as the partner of Polar Bear Ice entitled to wind up its affairs.  From the amounts awarded and collected pursuant to this judgment, the plaintiff shall pay the debts of the partnership, then reimburse all capital contributions of the partners, and then distribute any remaining amounts to the partners in such proportion as they agreed to divide profits and losses.  To the extent there is a dispute as to the partnership's debts or the partners' capital contributions, such dispute must be resolved in the appropriate nonbankruptcy forum.

Dated: January 15, 2018

By the Court

Michael S. McManus
United States Bankruptcy Judge

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC.

Brant J. Bordsen
1129 D St
PO Box A
Marysville CA 95901

Gabriel E. Liberman
1395 Garden Highway #150
Sacramento CA 95833